IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

UNITED STATES OF AMERICA

CASE No: 5:13cr46/RS-1

vs.

JOHN C. WALL
_____/

STATEMENT OF FACTS FOR GUILTY PLEA
AND NOTICE OF ELEMENTS

I.  STATEMENT OF FACTS

The parties agree with the truthfulness of the following factual basis for the defendant's guilty plea. The undersigned parties further agree that not all of the facts known from this investigation are contained in this brief summary.

A. Introduction:

Defendant John C. Wall is the owner and president of Freedom Marketing, Inc. ("FMI"), a company located in Panama City Beach, Florida.

On or about October 1, 2005, co-defendant Gilberto Lopez approached Defendant Wall and offered to assist him in the export business. For approximately five months, Defendant Wall occasionally received export consulting service from co-defendant Lopez until on or about March 10, 2006, when Defendant Wall engaged co-defendant Lopez as a full-time consultant to manage all international sales for FMI. After that time, and continuing throughout the events set forth in the indictment, co-defendant Lopez was primarily responsible for exports to Mexico and Venezuela and, in that capacity, provided advice and guidance to Defendant Wall and Defendant Casey Patrick Lee.

FILED IN OPEN COURT THIS

_5|8|14_

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA

On May 25, 2006, Defendant Lee was hired as a buyer for FMI. In the middle of 2007, Defendant Wall promoted Defendant Lee to a manager position. Prior to December 2008, Defendant Lee was responsible for manufacturing process control and supply chain management. In December 2008, Defendant Lee's duties expanded to overseeing packaging and labeling.

For many years, FMI had been importing parts from China and selling them to customers in the United States. One of the Chinese companies FMI contracted with to manufacture automobile parts for FMI was a company named Qingdao Haizhiguan Company, Ltd. ("Qingdao Company"), located in Qingdao, China. Before and during the time period set forth in the indictment, Defendant Wall made trips to Qingdao, China, to visit Qingdao Company. In February 2007, Defendant Lee made his first trip to China to accompany a client to audit the manufacturing process at Qingdao Company. During this same time period, defendants, or others acting on behalf of FMI and at their direction, purchased and imported into the United States, automobile parts from Qingdao Company, and had the parts shipped to FMI's warehouse in Panama City Beach, Florida.

With co-defendant Lopez's guidance, FMI began selling automobile parts to customers in Mexico and Venezuela, who were then selling the automobile parts to consumers in their respective areas. The customers in Mexico and Venezuela wanted to sell the automobile parts to consumers as if they were parts manufactured in the United States. As such, co-defendant Lopez worked with sales representatives in Mexico to develop proposed packaging designs and sent them to Defendant Wall. Defendant Wall would forward the proposed packaging designs and requirements to Defendant Lee, who would then forward the proposed packaging designs and requirements to the

manufacturer in China. Once the manufacturer completed a proposed packaging design, the manufacturer would forward the proposed design to FMI for approval. Afterwards, FMI imported automobile parts that were manufactured in China and labeled the parts or had the parts labeled as if they were manufactured in the United States. In addition, at the request of FMI's customers in Mexico and Venezuela, FMI agreed to submit false and misleading export information to falsely reflect that the parts were products of the United States. This assisted FMI's customers in Mexico in avoiding import tariff fees that would be owed to Mexico if the parts were indeed products of China and not the United States. It should be noted that the false labeling did not reduce any import duties owed by FMI to the United States, but rather those import duties owed to Mexico by FMI's customers in Mexico.

### B. Illegal Importation:

Between on or about October 9, 2005, and on or about April 2, 2009, in the Northern District of Florida and elsewhere, the defendant did knowingly and willfully conspire with the co-defendants, or with other persons, to commit an offense against the United States by importing automobile parts into the United States contrary to law, or did receive, buy, sell, or facilitate the transportation or sale of such merchandise after importation, knowing the same to have been imported into the United States contrary to law, which they intended to sell and export to foreign customers, and did, in fact, sell and export to such customers. In furtherance of the conspiracy, between on or about October 9, 2005, and on or about April 2, 2009, the defendants, or others acting on behalf of FMI and at the defendants' direction, caused some of the parts that FMI imported into the United States to be labeled "Processed in the U.S.A.," when in truth and fact, and as the

defendants then and there well knew, said imported boxes contained products manufactured in China.

As part of this illegal activity, on or about December 2, 2008, the defendants, or others acting on behalf of FMI and at the defendants' direction, imported and entered into the United States under entry number 279-9577748-2, approximately 6,700 automobile water pumps manufactured in China and purchased and imported from companies in China. The boxes in which the merchandise was packaged were marked "Processed in the U.S.A." CBP seized this merchandise on January 13, 2009, under CBP seizure case number 2009-2002-000022-01.

On or about December 10, 2008, the defendants, or others acting on behalf of FMI and at the defendants' direction, imported and entered into the United States under entry number 279-9577770-6, approximately 1,686 automobile water pumps manufactured in China and purchased and imported from a company in China. The boxes in which the merchandise was packaged were marked "Processed in the U.S.A." CBP seized this merchandise on January 29, 2009, under CBP seizure case number 2009-2002-000026-01.

On or about January 8, 2009, the defendants, or others acting on behalf of FMI and at the defendants' direction, imported and entered into the United States under entry number 279-9577785-4, approximately 1,052 automobile water pumps, 2,540 clutch parts and 788 hydraulic clutch bearings purchased and imported from a company in China which did not contain proper country of origin markings. CBP seized this merchandise on February 11, 2009, under CBP seizure case number 2009-2002-000027-01.

On or about January 23, 2009, the defendants, or others acting on behalf of FMI and at the defendants' direction, imported and entered into the United States under entry number 279-9616787-3, approximately 319 automobile fuel filters purchased and imported from a company in China which did not contain proper country of origin markings. CBP seized this merchandise on February 23, 2009, under CBP seizure case number 2009-2002-000032-1.

On or about December 15, 2008, after being notified by government officials about the above seizures and improper country of origin markings, Defendant Lee sent an email message to Qingdao Company stating, in part, "We must immediately remove any wording that states processed in U.S.A. from all boxes. . . . Please review and confirm these changes."

C. **Illegal Exportation:**

Between on or about October 9, 2005, and on or about April 2, 2009, in the Northern District of Florida and elsewhere, the defendant did knowingly and willfully conspire with the co-defendants, or with other persons, to commit an offense against the United States by fraudulently and knowingly exporting automobile parts from the United States contrary to law or regulation of the United States, or did receive, conceal, buy, sell, or facilitate the transportation, concealment, or sale of such merchandise prior to exportation, knowing the same to have been intended for exportation contrary to any law or regulation of the United States.

In furtherance of the conspiracy, the defendants, or others acting on behalf of FMI and at the defendants' direction, promoted and subsequently sold and exported automobile parts to sales representatives and customers in Mexico and Venezuela.

Specifically, between on or about October 9, 2005, and on or about December 18, 2008, co-defendant Lopez and others contacted sales representatives and customers in Mexico and Venezuela to promote and sell to them automobile parts that were manufactured in China. Per the request of the sales representatives in Mexico and Venezuela, the automobile parts would be marked and sold to the end customer as products of the United States. FMI agreed and provided samples of automobile parts to sales representatives and customers in Mexico and Venezuela. As a result of co-defendant Lopez's selling efforts, during this same time period, sales representatives and customers in Mexico and Venezuela agreed to purchase automobile parts from FMI. Thereafter FMI exported automobile parts to customers in Mexico and Venezuela.

Between on or about October 9, 2005, and on or about December 18, 2008, prior to the automobile parts being exported to Mexico and Venezuela, the defendants, or others acting on behalf of FMI and at the defendants' direction, caused the automobile parts to be labeled as products of the United States, which labeling was intended to falsely and fraudulently conceal information relating to the manufacturer of the automobile parts.

On or about April 25, 2007, Defendant Wall and co-defendant Lopez received an email addressed to Lopez from a sales representative in Mexico. Photographs of a shipment of automobile parts that were shipped to the sales representative from FMI were attached. One of the attached photographs showed a sticker on the outside of a box that said "Korean Air." In the email, the sales representative told co-defendant Lopez that the sales representative was able to persuade the broker to accept the automobile parts as United States products, but complained "it's obvious." On or about April 25, 2007,

Defendant Wall forwarded this email to Defendant Lee and sent a copy of the email to co-defendant Lopez and other employees of FMI. In the email, Defendant Wall stated: "Casey, the guys in the warehouse cannot leave 'Korean Air' stickers on this stuff."

In addition, in furtherance of the conspiracy, the defendants, or others acting on behalf of FMI and at the defendants' direction, provided false and misleading North American Free Trade Agreement ("NAFTA") certificates of origin to FMI's customers in Mexico. Specifically, the defendants provided false information on the NAFTA certificates relating to the country of origin by claiming that exported automobile parts were products of the United States when, in truth and fact, and as the defendants then and there well knew, said exported automobile parts were manufactured in China, which was intended to falsely and fraudulently conceal information relating to the country of origin. Co-defendant Lopez specifically provided instructions to one or more employees of FMI on how to falsely complete the NAFTA certificates of origin. As a result, between on or about October 9, 2005, and on or about December 5, 2008, employees of FMI completed and signed NAFTA certificates of origin that falsely stated that the country of origin for the automobile parts being exported was the United States. Defendant Wall signed a NAFTA certificate of origin on or about August 4, 2005. Defendant Lee signed a NAFTA certificate of origin on or about March 21, 2007.

Freight forwarders or other transportation intermediaries engaged by FMI to facilitate exports to Mexico and Venezuela, acting in reliance on such false NAFTA certificates of origin, filed Shippers Export Declarations (SED's) or, after SED's were discontinued, Electronic Export Information ("EEI") under the Automated Export System ("AES"), containing the notation "D" (for domestic) to indicate that the shipments were

of domestic origin. These filings caused incorrect export information to be compiled by U.S. Census.

As one example, on or about December 30, 2008, relying on information provided by FMI and at the defendants' direction, an export AES document was completed and submitted for a shipment of automobile parts that were being exported to Venezuela. The AES falsely declared "D" for domestic indicating the automobile parts being exported were domestic products when in fact, the parts were manufactured in China. On or about February 2, 2009, the automobile parts were exported from the United States to Venezuela.

As another example, on or about January 9, 2009, relying on information provided by FMI and at the defendants' direction, an export AES document was completed and submitted for a shipment of automobile parts that were being exported to Venezuela. The AES falsely declared "D" for domestic indicating the automobile parts being exported were domestic products when in fact, the parts were manufactured in China. On or about January 12, 2009, the automobile parts were exported from the United States to Venezuela.

The illegal exportations to Mexico and Venezuela continued until the last export to Mexico on or about December 12, 2008, and the last export to Venezuela on or about February 2, 2009.

Co-defendant Lopez sent numerous emails to Defendant Wall and others representing that he alone was responsible for FMI's export business and that all decisions were to be made by him. On or about January 24, 2009, Defendant Wall sent

an email to co-defendant Lopez instructing co-defendant Lopez that "Nafta with china product is wrong."

As a result of the above unlawful activity, between on or about October 9, 2005, and on or about April 2, 2009, FMI sold thousands of automobile parts to importers in Mexico and earned approximately $2.5 million in sales revenue. As a result of the false NAFTA certificates of origin, which falsely stated that the United States was the country of origin for the exported automobile parts instead of China, the importers of the automobile parts in Mexico avoided paying duties to Mexico, which are estimated to be approximately $187,618.37. The total amount of duties avoided has not yet been determined.

## II. NOTICE OF ELEMENTS:

### A. Conspiracy in violation of Title 18, United States Code, Section 371

It's a separate Federal crime for anyone to conspire or agree with someone else to do something that would be another Federal crime if it was actually carried out.

A "conspiracy" is an agreement by two or more persons to commit an unlawful act. In other words, it is a kind of partnership for criminal purposes. Every member of the conspiracy becomes the agent or partner of every other member.

The Defendant can be found guilty only if all the following facts are proved beyond a reasonable doubt:

(1) two or more people in some way agreed to try to accomplish a shared and unlawful plan;

(2) the Defendant knew the unlawful purpose of the plan and willfully joined in it;

(3) during the conspiracy, one of the conspirators knowingly engaged in at least one overt act described in the indictment; and

(4) the over act was committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

9

### B. Underlying offense of Illegal Importation in violation of Title 18, United States Code, Section 554:

Title 18, United States Code, Section 545 makes it a crime to smuggle goods into the United States. For you to find the defendant guilty, the government must prove each of the following beyond a reasonable doubt:

(1) the defendant fraudulently or knowingly imported or brought merchandise

(2) into the United States; and

(3) contrary to the law[1] of the United States.

### C. Underlying offense of Illegal Exportation in violation of Title 18, United States Code, Section 554

Title 18, United States Code, Section 554 makes it a crime to smuggle goods from the United States. For you to find the defendant guilty, the government must prove each of the following beyond a reasonable doubt:

(1) the defendant fraudulently or knowingly exported or sent merchandise;

---

[1] Title 19, United States Code, Section 1304 regulates the marking of imported articles and containers. Pursuant to Section 1304(a), "…every article or foreign origin (or its container, as provided in subsection (b) hereof) imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of the article." Pursuant to Section 1304(l), "[A]ny person who, with the intent to conceal the information given thereby or contained therein, defaces, destroys, removes, alters, covers, obscures, or obliterates any mark required under the provisions of this chapter shall: (1) upon conviction for the first violation of this subsection, be fined not more than $100,000, or imprisoned for not more than 1 year, or both."

(2) from the United States; and

(3) contrary to a law[2] or regulation[3] of the United States.

PAMELA C. MARSH
United States Attorney

/s/ Michael L. Brown
MICHAEL L. BROWN
Attorney for Defendant

May 8, 2014
Date

/s/ John C. Wall
JOHN C. WALL
Defendant

May 8, 2014
Date

/s/ J. Ryan Love
J. RYAN LOVE
Florida Bar No. 0637920
Assistant U.S. Attorney
Northern District of Florida
21 E. Garden Street, Suite 400
Pensacola, Florida 32502-5675
850-444-4000

5-8-14
Date

---

[2] Pursuant to Title 13, United States Code, Section 305(a)(1), "[A]ny person who knowingly fails to file or knowingly submits false or misleading export information through the Shippers Export Declaration (SED) or the Automated Export System (AES) shall be subject to a fine not to exceed $10,000 per violation or imprisonment for not more than five years, or both.

[3] Chapter 15, part 30, of the Code of Federal Regulations, sets forth regulations for foreign trade to include, but not limited to, the requirement that the filer of the export data be responsible for submitting complete and accurate information known at the time of export. The export information shall include the country of destination, the foreign recipient of the merchandise, indicate whether the goods exported are of domestic or foreign origin, as well as other requirements.

11